Affirmed and Memorandum Opinion filed June 30, 2009








Affirmed and Memorandum Opinion filed June 30, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00827-CR

____________

 

DAMIAN LORENZO GREEN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 434th
District Court

Fort Bend County, Texas

Trial Court Cause No. 40,619A

 



 

M E M O R A N D U M   O P I N I O N

Appellant
Damian Lorenzo Green challenges his conviction for felony murder.  After the
jury found appellant guilty, the trial court assessed punishment as confinement
for 45 years.  Appellant contends (1) the evidence is legally and factually
insufficient to support the jury=s findings that he knowingly
discharged a firearm in complainant=s direction on July 24, 2004 and
killed her; (2) the trial court erred in denying his request that the jury be
instructed on felony and misdemeanor deadly conduct; and (3) the trial court
erred in instructing the jury on the law of parties.  We affirm.








Background

Houston
Police Officer George Lucero responded to a shooting in progress at 4:23 a.m.
on July 24, 2004 outside a club in the 15800 block of South Post Oak Boulevard
in Houston.  Upon arriving at the crime scene at approximately 4:26 a.m., Officer
Lucero observed the complainant, Lashonda Byrd, lying on the ground and being
assisted by emergency medical personnel.  

During
Officer Lucero=s investigation, witness Denise Lopez told him that an African-American
male in a blue sport utility vehicle Astuck his body out the window and
shot at the crowd.@  Lopez also told Officer Lucero that three males, including
the assailant, were in the SUV.

While
Officer Lucero was attempting to control the crowd at the crime scene, Houston
Police Officer Cecilio Pena, Jr., stopped a blue Ford Expedition SUV with shiny
rims for running a stop sign less than one mile from the shooting scene. 
During the traffic stop, Officer Pena observed that the SUV contained three
African-American males.  Officer Pena also noticed during the stop that the
driver and front-seat passenger of the SUV appeared very nervous.

Officer
Pena requested the SUV driver=s identification, which he did not have with him.  The driver
explained that the SUV was his friend=s, and that he was driving because
his friend had just gotten into a fight at a club.  The front-seat passenger
then exited the SUV and handed Officer Pena his identification, which
identified him as appellant.  Officer Pena noticed that appellant was not
wearing a shirt and had numerous tattoos, including a pit bull on his chest. 
Appellant told Officer Pena that he owned the SUV; Officer Pena discovered that
the SUV was registered to appellant=s mother.








Officer
Lucero requested assistance, at which point Officer Pena concluded his traffic
stop of the blue SUV.  Officer Pena arrived at the crime scene within five
minutes of Officer Lucero=s request.  Officer Pena learned of the description of the
blue SUV and its occupants from talking to Officer Lucero and overhearing
conversations among the crowd gathered at the crime scene.  

Upon
learning this information, Officer Pena realized that it matched the
description of the vehicle and persons he had stopped minutes earlier.  In
particular, Officer Pena noted that the assailant was described as having been
in the front passenger seat with no shirt and a stocky build.  Officer Pena
left the crime scene and returned to the area of the traffic stop in hopes of
locating the SUV or its occupants.  Officer Pena saw the SUV and a chase
ensued.  Officer Pena was unable to catch the fleeing SUV because his patrol
car began experiencing engine trouble.

Houston
Police Officer Justin Wood responded to the crime scene as part of the Homicide
Division=s Crime Scene Unit.  Officer Wood
found one fired bullet and spent shell casing at the crime scene.  The bullet
had no visible signs of blood or serological fluid, hair, skin, or tissue
present.

Houston
Police Sergeant David Ferguson responded to the crime scene as part of the
Homicide Division=s investigation.  Sergeant Ferguson discovered while at the
scene that Byrd had been transported to a hospital, where she was pronounced
dead.  Sergeant Ferguson obtained appellant=s name from Officer Pena as a
possible suspect in the shooting.  Sergeant Ferguson then returned to the
police station and prepared a photo spread containing pictures of appellant and
five similar-looking men.  








Sergeant
Ferguson showed this photo spread to four eyewitnesses C Denise Lopez, Shannon Nealey, Ana
Arbelaez, and Kimberly Bradley.  Bradley, who was Lashonda Byrd=s sister, identified appellant as the
person who shot Byrd.  Lopez, Nealey, and Arbelaez did not identify anyone in
the photo spread as the assailant.  Houston Police Sergeant E. T. Yanchak, also
with the Homicide Division, showed the photo spread to witness Dean Williams;
he identified appellant as the person who shot Byrd.

Byrd=s body was transported to the Harris
County Medical Examiner=s Office from the hospital.  Dr. Dewayne Wolf supervised Byrd=s autopsy on July 24, 2004.  The
autopsy revealed the cause of Byrd=s death to be a gunshot wound to the
abdomen, and Byrd=s death was classified as a homicide.  One bullet penetrated
Byrd=s body, piercing her kidney, liver,
aorta, stomach, diaphragm, one vertebrae, and two ribs before exiting her
body.  These injuries caused Byrd to bleed to death.  The bullet entered Byrd=s body on her right side and exited
through her left side, approximately one inch higher than the entrance wound. 

Laboratory
testing on the bullet and casing found at the crime scene indicated that they
came from a nine-millimeter Ruger handgun.  Testing was unable to determine
whether the bullet found was the one that killed Byrd.  Using information
gathered during the shooting investigation and the July 24, 2004 traffic stop,
police located and arrested appellant a few days after the shooting.  Appellant
was charged with felony murder for causing Byrd=s death in the course of committing
felony deadly conduct.  

Trial
began on May 22, 2007.  During trial, testimony was provided by Officers
Lucero, Pena, and Wood; Sergeants Ferguson and Yanchak; and Dr. Wolf.  Officer
Pena identified appellant in open court as the front-seat passenger he encountered
during the July 24, 2004 traffic stop.








The
State called Denise Lopez, who testified that she and her friends were outside
the club when they heard two men arguing.  Lopez also testified that she had
taken one ecstasy pill 20 minutes before the argument, but that she was still
aware of her surroundings when she observed the argument and shooting.  Lopez
testified that one of the men involved in the argument was a tall,
light-skinned African-American and the other was a short, stocky, dark-skinned
African-American.  According to Lopez, the short, stocky man removed his shirt
during the argument, and she never saw him put it back on.  Lopez further
testified that after the argument she saw the short, stocky man get into the
front passenger side of a Ford Expedition SUV carrying three or four
individuals, sit on the edge of the door, and hang outside the SUV.

Lopez
testified that she saw the short, stocky man reach over the top of the SUV with
something shiny in his hand, which she believed to be a black gun.  Lopez
further testified that the short, stocky man pointed the shiny object in the
air in the direction of the group that included Byrd, and that she heard three
gunshots immediately afterward.  Lopez testified that she believed the short,
stocky man in the SUV fired the gunshots, but that she could not say for
certain because his body blocked her view and she dropped to the ground to
protect herself once the shooting began.  Lopez could not identify appellant as
the short, stocky man from the shooting in open court.  Lopez also testified
that the short, stocky man was the only person she saw with a gun during the
incident.

The
State then called Dean Williams, who testified that he went to the club on July
24, 2004 with Byrd, Nealey, and Bradley.  Williams testified that he had known
appellant for a few months, and that the two began arguing at the club.  Williams
also testified that he had been drinking alcohol throughout the evening and was
probably intoxicated, but that he had stopped drinking at 2:00 a.m. and was
aware of what was going on around him at the time of the shooting.  Williams
testified that after arguing with appellant for between five and 10 minutes,
Williams turned and began walking away. 








Williams
further testified that he heard someone say, A[H]e=s got a gun.@  At that point, Williams looked back
and saw appellant holding a gun straight up in the air and sitting on the edge
of the front passenger side of a Abluish-green@ Ford Expedition SUV.  Williams
testified that another African-American male was in the SUV with appellant. 
Williams testified that he heard Amaybe a couple@ of shots fired and then saw Byrd
lying on the ground.  Williams testified that he believed appellant fired the
gunshots he heard, but that he only saw appellant discharge the gun once into
the air because Williams hid behind a van after seeing appellant with a gun. 
Williams testified that he did not see whether appellant aimed the gun toward
Byrd or anyone else when appellant fired the gun after the initial shot into
the air.  Williams testified that he did not see or hear about anyone other than
appellant using a gun during the shooting.

The
State then called Ana Arbelaez, who testified that she witnessed an argument
between Williams and a short, stocky male at the club on July 24, 2004. 
Arbelaez testified that she had taken two ecstasy pills C one at approximately 11:00 p.m. and
one at approximately 3:30 a.m. C and that they did not affect her ability to understand what
was going on at the time of the shooting.  Arbeleaz testified that she believed
the short, stocky male removed his shirt at some point during the argument.

Arbelaez
further testified that she saw the short, stocky male sitting on the edge of
the passenger side of a blue Ford Expedition SUV.  Arbelaez testified that she
saw the short, stocky male reach over the top of the SUV with a gun and fire
approximately five shots in Byrd=s direction.  Arbelaez testified that
she only saw the first gunshot C which she described to police that night as being Awild,@ or Akind of just anywhere@ C after which she dropped to the
ground to protect herself.  Arbelaez testified that she saw two people in the
SUV that night even though she initially told police that she saw four people
in the SUV.  Arbelaez testified that once the shooting stopped she saw Byrd
lying motionless on the ground.  Arbelaez testified that she did not get a good
look at the short, stocky male, but she identified appellant in open court as
having a similar build.  Arbelaez testified to her belief that the short,
stocky male she saw shooting from the SUV killed Byrd.








The
State also called Shannon Nealey, Byrd=s sister-in-law, who testified that
she, Byrd, Bradley, and Williams went to the club on July 24, 2004.  Nealey
testified that while the group was there, an argument arose between Williams
and appellant, whom she testified was the aggressor.  Nealey testified that
appellant took his shirt off during the argument, and that she could see that
he had several tattoos.  Nealey further testified that she saw someone give
appellant a gun, which he placed in his waistband.  Nealey testified that she
heard someone say, A[H]e=s got a gun.@  She, Byrd, and Bradley began walking toward their vehicle
at that point.

Nealey
testified that she saw appellant get into the passenger side of a blue SUV;
hang out of the SUV; point a gun in the direction of her, Bradley, and Byrd
over the top of the SUV; and begin shooting in their direction.  Nealey
testified that she initially told police that she did not see the discharge of
the gun, but instead heard Atwo or three shots@ and then turned around.  Nealey also
testified that she saw two people in the blue SUV.  Nealey testified that upon
hearing the gunshots she immediately dropped to the ground for protection.  

Nealey
further testified that she heard Bradley say Byrd had been shot.  Nealey
testified that she turned around and saw Byrd take a step toward her before
falling to the ground.  Nealey testified that she called 9-1-1 and tried to
slow Byrd=s blood loss by applying pressure to the right side of Byrd=s body.  Nealey identified appellant
in open court as the person who shot at her, Bradley, and Byrd on July 24,
2004.  Nealey further testified that appellant was the only person she saw with
a gun during the shooting. 

The
State called Bradley as its final witness.  Bradley testified that she, Byrd,
Nealey, and Williams went to the club on July 24, 2004.  Bradley testified that
while the group was there, an argument arose between Williams and appellant. 
Bradley also testified that appellant removed his shirt during the argument. 
Bradley identified appellant in open court as the man she saw arguing with
Williams at the club.  Bradley testified that she identified appellant in a
photo spread shown to her by police as the man who shot and killed Byrd.  








Bradley
testified that she, Byrd, and Nealey were walking away from Williams and
appellant when appellant got into the passenger side of a blue Ford Expedition
SUV with Abig round rims.@  Bradley further testified that she saw appellant hanging
out of the passenger side window of the SUV yelling.  Bradley testified that
there were two other individuals in the SUV with appellant.  Bradley also
testified that she was uncertain whether the back windows of the SUV were up or
down when the shooting occurred, but that they were up when appellant got into
the SUV.  

Bradley
testified that appellant pulled out a gun, faced the three women, and pointed
the gun in their direction.  Bradley testified that she turned to warn Byrd,
but was unable to do so before hearing two gunshots.  Bradley also testified
that she saw the first gunshot and smoke and sparks coming from appellant=s gun.  Bradley testified that Byrd
told her that she had been shot before Byrd fell to the ground.  Bradley
testified that no one had a gun during the shooting other than appellant.  The
State then rested its case.  Appellant presented no evidence in his defense.

During
the jury charge conference, appellant requested that the jury be instructed on
misdemeanor and felony deadly conduct as lesser included offenses of felony
murder.  The trial court denied appellant=s request.  As a result, the jury
charge gave the jury two options: (1) convict appellant of felony murder; or
(2) acquit appellant.  Appellant also objected to the instruction on the law of
parties included in the proposed jury charge.  The trial court overruled
appellant=s objection.

The jury
convicted appellant of felony murder as charged in the indictment on May 25,
2007.  The trial court assessed appellant=s punishment as confinement for 45
years, and signed its judgment imposing this sentence on September 11, 2007. 
Appellant appeals from this judgment.

Analysis








Appellant
challenges the legal and factual sufficiency of the evidence supporting the
jury=s findings that he knowingly
discharged a firearm in Byrd=s direction on July 24, 2004 and killed her.  Appellant
further contends that the trial court erred in denying his request that the
jury be instructed on misdemeanor and felony deadly conduct as lesser included
offenses of felony murder.  Additionally, appellant challenges the trial court=s overruling of his objection to the
inclusion in the jury charge of an instruction on the law of parties.  We
address each challenge in turn.

I.          Legal and
Factual Sufficiency

An
individual commits felony murder if the individual commits or attempts to
commit a felony, other than manslaughter, and in the course of and in
furtherance of the commission or attempt, he commits or attempts to commit an
act clearly dangerous to human life that causes the death of another
individual.  Tex. Penal Code Ann. _ 19.02(b)(3) (Vernon 2003).

An
individual commits felony deadly conduct if the individual knowingly discharges
a firearm at or in the direction of one or more individuals.  Id. _ 22.05(b)(1), (e) (Vernon 2003).  An
individual commits misdemeanor deadly conduct if the individual recklessly
engages in conduct that places another in imminent danger of serious bodily
injury.  Id. _ 22.05(a), (e).

Appellant=s sufficiency challenges focus on
whether the State proved beyond a reasonable doubt that (1) he; (2) knowingly
discharged a firearm in Byrd=s direction; and (3) killed her.  Because much of the
evidence is relevant to more than one of these individual findings, we address
them together.

A.        Legal Sufficiency








In
reviewing legal sufficiency of the evidence, an appellate court will examine
the evidence in the light most favorable to the State to determine whether any
rational finder of fact could have found the essential elements of the offense
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319
(1979); Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). 
The court does not sit as another juror and may not re-evaluate the weight and
credibility of the evidence or substitute its judgment for that of the fact
finder.  Dewberry, 4 S.W.3d at 740.

Reconciliation
of conflicts in the evidence is within the exclusive province of the fact
finder.  See Mosley v. State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998)
(en banc).  The appellate court=s duty is not to reweigh the evidence, but to serve as a
final due process safeguard ensuring only the rationality of the fact finder.  See
Williams v. State, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996).  An
appellate court faced with a record of facts that supports conflicting
inferences must presume _ even if not obvious from the record _ that the finder of fact resolved any such conflicts
in favor of the State, and must defer to that resolution.  Jackson, 443
U.S. at 326.








The
State presented ample evidence of appellant=s identity as the assailant at the
club on July 24, 2004: (1) Officer Pena=s testimony that he stopped appellant
less than one mile from the crime scene within minutes of the shooting, and
that appellant matched the description of the assailant; (2) Officer Pena=s in-court identification of
appellant as the front-seat passenger he encountered during his July 24, 2004
traffic stop of a blue Ford Expedition SUV; (3) Sergeant Ferguson=s testimony that Bradley identified
appellant as the assailant from a photo spread; (4) Sergeant Yanchak=s testimony that Williams identified
appellant as the assailant from a photo spread; (5) Williams=s testimony that he saw appellant
sitting on the edge of the front passenger side of a Abluish-green@ Ford Expedition SUV with a gun
moments before the shooting; (6) Williams=s testimony that he did not see or
hear about anyone other than appellant using a gun during the shooting, and
that he believed that appellant fired the gunshots at the club; (7) Arbelaez=s testimony that a man with a build
similar to appellant=s sitting on the edge of the passenger side of a blue Ford
Expedition SUV fired approximately five gunshots C the first of which she saw C during the shooting; (8) Nealey=s testimony that she saw appellant
get into the passenger seat of a blue SUV, hang out of the SUV, point a gun in
the direction of her, Bradley, and Byrd, and start shooting; (9) Nealey=s in-court identification of
appellant as the person who shot at her, Bradley, and Byrd, and Nealey=s testimony that appellant was the
only person she saw with a gun during the incident; (10) Bradley=s testimony that she saw appellant
hanging out of the passenger side window of a blue Ford Expedition SUV when he
pulled out a gun, pointed it toward her, Nealey, and Byrd, and fired two shots;
(11) Bradley=s testimony that she saw the first gunshot and smoke and sparks coming
from appellant=s gun; (12) Bradley=s testimony that no one had a gun during the shooting except
appellant; and (13) Bradley=s in-court identification of appellant as the man who was
arguing with Williams and eventually started shooting at the club, and her
testimony that she identified appellant as the assailant from a photo spread.

The
State presented the following evidence that appellant knowingly discharged a
firearm Ain the direction of one or more
individuals@ identified in the indictment:  (1) Officer Lucero=s testimony that Lopez told him the
assailant Ashot at the crowd@; (2) Lopez=s testimony that the short, stocky man that she believed to
be the assailant had argued with a tall, light-skinned African-American man
immediately before he began shooting; (3) Lopez=s testimony that the assailant
pointed what she believed to be a gun in the air in the direction of the group
that included Byrd before firing three shots; (4) Williams=s testimony that he and appellant
argued for between five and 10 minutes immediately before the shooting; (5)
Arbelaez=s testimony that she saw a man with a
build similar to appellant=s arguing with Williams at the club; (6) Arbelaez=s testimony that the man with a build
similar to appellant=s fired approximately five gunshots in the direction of Byrd;
(7) Nealey=s testimony that appellant argued with Williams immediately before the
shooting, and that appellant was the aggressor in that argument; (8) Nealey=s testimony that immediately after
the argument appellant pointed a gun in the direction of her, Bradley, and
Byrd, and fired Atwo or three shots@ at them; (9) Bradley=s testimony that appellant argued
with Williams immediately before the shooting; and (10) Bradley=s testimony that immediately after
the argument appellant pointed a gun toward her, Nealey, and Byrd, and fired
two shots in their direction.








In
addition to the evidence described above, the State presented further evidence
that appellant=s gunfire killed Byrd: (1) Officer Wood=s testimony that he found a fired
bullet and spent shell casing at the crime scene; (2) Dr. Wolf=s testimony that Byrd died from
internal bleeding caused by a single gunshot wound to the abdomen; (3) Lopez=s testimony that she heard three
gunshots during the shooting, and that the short, stocky male she saw in the
blue Ford Expedition SUV was the only person she saw with a gun; (4) Williams=s testimony that he heard Amaybe a couple of shots@ fired and then saw Byrd lying on the
ground; (5) Williams=s testimony that he did not see or hear about anyone other
than appellant using a gun during the shooting; (6) Arbelaez=s testimony that after the assailant
fired five times in Byrd=s direction she saw Byrd lying motionless on the ground; (7)
Arbelaez=s testimony that she believed that a
man with a build similar to appellant=s killed Byrd on July 24, 2004; (8)
Nealey=s testimony that she heard Atwo or three shots,@ heard Bradley say that Byrd had been
shot, and then saw Byrd take one step and fall to the ground; (9) Nealey=s testimony that appellant was the
only person she saw with a gun during the shooting; (10) Bradley=s testimony that she heard two
gunshots and Byrd then told her that she had been shot before falling to the
ground; and (11) Bradley=s testimony that no one had a gun during the shooting except
for appellant.

Viewing
the evidence described above in the light most favorable to the jury=s verdict, a rational fact finder
could have found beyond a reasonable doubt that on July 24, 2004, appellant
knowingly discharged a firearm in Byrd=s direction and killed her.  See
Jackson, 443 U.S. at 319; Dewberry, 4 S.W.3d at 740.  

B.        Factual Sufficiency








When
conducting a factual sufficiency review, an appellate court must determine
whether (1) the evidence introduced to support the verdict is Aso weak@ that the fact finder=s verdict seems Aclearly wrong and manifestly unjust,@ and (2) the contrary evidence is so
strong that the standard of proof beyond a reasonable doubt could not have been
met.  Prible v. State, 175 S.W.3d 724, 730-31 (Tex. Crim. App. 2005). 
We view the evidence in a neutral light in a factual sufficiency review.  Id.

In order
to declare that an evidentiary conflict justifies a new trial, an appellate
court must rely on some objective basis in the record demonstrating that the
great weight and preponderance of the evidence contradicts the jury=s verdict.  See Lancon v. State,
253 S.W.3d 699, 706-07 (Tex. Crim. App. 2008).  An appellate court should not
intrude upon the fact finder=s role as the sole judge of the weight and credibility of
witness testimony.  Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim.
App. 2002).  

The jury
may choose to believe or disbelieve any portion of the testimony.  Bargas v.
State, 252 S.W.3d 876, 887 (Tex. App.CHouston [14th Dist.] 2008, no pet.)
(citing Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (en
banc)).  Due deference must be given to the fact finder=s determinations concerning the
weight and credibility of the evidence, and reversal of those determinations is
appropriate only to prevent the occurrence of a manifest injustice.  Martinez
v. State, 129 S.W.3d 101, 106 (Tex. Crim. App. 2004).

Appellant=s factual sufficiency challenges
mirror his legal sufficiency challenges.  Appellant=s theory at trial was that someone
else at the club C possibly another occupant of the SUV C fired the fatal bullet.  Appellant
relies heavily upon admissions by witnesses during cross-examination that it
was Apossible@ that someone else at the club could
have had a gun and shot Byrd, but there is no direct testimony supporting
either of these Apossibilities.@  Because the substantial evidence
supporting the jury=s findings is thoroughly described above, we do not repeat it
here.








Appellant
emphasizes the following evidence in support of his factual sufficiency
challenge regarding his identity as the assailant at the club: (1) the failure
of Lopez, Arbelaez, and Nealey to positively identify appellant in the photo
spread as the assailant; (2) the failure of Lopez and Arbelaez to positively
identify appellant in open court as the assailant; (3) the testimony from all
witnesses to the shooting that other individuals were in the SUV from which
shots were fired; (4) Lopez=s testimony that she could not say for certain that the
short, stocky man in the SUV was the assailant; (5) Williams=s testimony that he heard Amaybe a couple@ of shots fired, but that he only saw
appellant discharge the gun once; (6) Arbelaez=s testimony that she heard five
gunshots but only saw the short, stocky man in the SUV fire the first one; (7)
Nealey=s testimony that she initially told
police she did not see the gun discharge when she heard Atwo or three shots@; (8) Bradley=s testimony that she was uncertain
whether the back windows of the SUV were up or down when the shooting occurred,
and that there were two other individuals in the SUV with appellant; and (9)
Bradley=s testimony that she saw appellant
fire the first gunshot during the shooting, but did not see whether he fired the
second one that she heard.

With
regard to whether he knowingly discharged a firearm Ain the direction of one or more
individuals@ named in the indictment, appellant highlights the following evidence:
(1) Lopez=s testimony that she could not say for certain whether the short, stocky
man in the SUV aimed at or fired toward anyone because his body blocked her
view; (2) Lopez=s testimony that the assailant pointed what she believed to
be a gun Ain the air@ in the direction of Byrd and her friends; (3) Williams=s testimony that he saw appellant
holding a gun straight up in the air, and that he saw appellant fire the gun
once into the air; (4) Williams=s testimony that he did not see whether appellant aimed the gun
at Byrd or anyone else when gunshots were fired after the initial shot into the
air; (5) Arbelaez=s testimony that she only saw the first gunshot fired by the
short, stocky man in the SUV, and that she described that shot to police as
being Awild,@ or Akind of just anywhere@; and (6) Nealey=s testimony that she initially told
police that she did not see the gun discharge.








In
addition to the above evidence highlighted by appellant, he emphasizes the
following evidence in support of his contention that he did not fire the bullet
that killed Byrd: (1) Officer Wood=s testimony that the bullet found at
the crime scene had no visible signs of blood or serological fluid, hair, skin,
or tissue present; (2) Officer Wood=s testimony that laboratory testing
could not determine whether the bullet found at the scene was the one that
killed Byrd; (3) Williams=s testimony that he only saw appellant fire one gunshot into
the air, but that he heard Amaybe a couple@ of shots fired; and (4) Arbelaez=s testimony that she only saw
appellant fire the first gunshot, but that she heard five gunshots.

In
challenging the factual sufficiency of the evidence to support the jury=s findings, appellant further relies
on his contention that (1) Lopez=s and Arbelaez=s testimony is unreliable because of
their use of ecstasy in the hours before the shooting; and (2) Williams=s testimony is unreliable because of
his admission that he was probably intoxicated at the time of the shooting. 
Judging the credibility of witnesses and the weight to be given their testimony
is exclusively within the jury=s province as finder of fact, and we may intrude upon its
determination only if required to prevent a manifest injustice.  See
Martinez, 129 S.W.3d at 106; Vasquez, 67 S.W.3d at 236; Bargas,
252 S.W.3d at 887.

Comparing
the evidence supporting appellant=s contentions with that supporting
the jury=s findings, and viewing all of the
evidence in a neutral light, we conclude that it is factually sufficient to
justify the jury=s findings that on July 24, 2004, appellant knowingly
discharged a firearm in Byrd=s direction and killed her.  See Prible, 175 S.W.3d at
730-31.  The jury=s findings are neither clearly wrong nor manifestly unjust.  See
id.; Martinez, 129 S.W.3d at 106.

We
overrule appellant=s issue regarding legal and factual sufficiency of the
evidence.

II.        Denial of Request for Jury Instructions on
Misdemeanor and Felony Deadly Conduct

Appellant
contends that the trial court erred by denying his request for jury
instructions on misdemeanor and felony deadly conduct as lesser included
offenses to felony murder.  The State asserts that appellant was not entitled
to a jury instruction on either offense based on the record in this case.








Upon the
defendant=s request, the trial court must instruct the jury on a lesser-included
offense if (1) the requested charge is for a lesser-included offense of the
charged offense; and (2) there is some evidence that, if the defendant is
guilty, he is guilty only of the lesser offense.  Guzman v.
State, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006). 

As noted
earlier, an individual commits felony murder if the individual commits or
attempts to commit a felony, other than manslaughter, and in the course of and
in furtherance of the commission or attempt, he commits or attempts to commit
an act clearly dangerous to human life that causes the death of another
individual.  Tex. Penal Code Ann. _ 19.02(b)(3).  A defendant commits felony deadly
conduct if he knowingly discharges a firearm at or in the direction of one or
more individuals.  Id. _ 22.05(b)(1), (e).  A defendant commits misdemeanor deadly
conduct if he recklessly engages in conduct that places another in imminent
danger of serious bodily injury.  Id. _ 22.05(a), (e).

The
State concedes that misdemeanor and felony deadly conduct are lesser-included
offenses in this case, but contends that appellant failed to establish that
there was some evidence that he was guilty only of one of these
offenses.  Appellant asserts on appeal that he was entitled to instructions on
these offenses because the record contains evidence that he acted only
recklessly.

Recklessness
and danger are presumed if the actor knowingly points a firearm at or in the
direction of another.  Id. _ 22.05(c).  A statutory presumption is not evidence
and does not supply evidence; rather, it is simply a permissive guide to
jurors.  Guzman, 188 S.W.3d at 193 & n.17.  A statutory presumption
is not an element of an offense because it is not part of the statutory
definition of the offense.  Id. at 193 & n.16.  A statutory
presumption may play no part in determining whether a defendant is entitled to
a lesser-included offense instruction.  Id. at 193.








A murder
defendant attempting to establish recklessness and his entitlement to a
misdemeanor deadly conduct instruction for a fatal shooting must produce
evidence or testimony that the gun accidentally discharged.  See Johnson v.
State, 915 S.W.2d 653, 659-60 (Tex. App.CHouston [14th Dist.] 1996, pet. ref=d) (citing Hayes v. State, 728
S.W.2d 804, 809-10 (Tex. Crim. App. 1987) (en banc), and Thomas v. State,
699 S.W.2d 845, 850 (Tex. Crim. App. 1985) (en banc)) (discussing offense of Areckless conduct,@ predecessor to offense of Adeadly conduct@).

Although
appellant references the statutes defining both misdemeanor and felony deadly
conduct and cites to the argument made at trial for lesser-included offenses
found in the record, he premises his argument on his assertion that the record
contains some evidence that appellant acted recklessly rather than knowingly. 
Appellant does not differentiate between misdemeanor and felony deadly conduct
throughout his argument, instead referring simply to the offense of Adeadly conduct.@  

Where an
appellant fails to develop in his brief any argument relating to the issue
complained of on appeal, or to cite to any relevant authority in support of his
contention on appeal, nothing is preserved for our review.  Tex. R. App. P.
38.1(i); Oldham v. State, 5 S.W.3d 840, 847 (Tex. App.CHouston [14th Dist.] 1999, pet. ref=d).  An argument that appellant acted
recklessly relates only to establishing appellant=s possible entitlement to a jury
instruction on misdemeanor deadly conduct because felony deadly conduct
requires the more culpable mental state of acting knowingly.  See Tex.
Penal Code Ann. _ 22.05(a), (b)(1); Guzman, 188 S.W.3d at 190-92.  Thus, we
conclude that appellant has waived his contention that he was entitled to a
jury instruction on felony deadly conduct because he premises his appellate
argument on evidence that he acted recklessly and does not offer argument as to
specifically why he was entitled to a felony deadly conduct instruction.  See
Tex. R. App. P. 38.1(i); Oldham, 5 S.W.3d at 847.








The
record does not support appellant=s contention that he acted recklessly
in discharging a firearm at the club on July 24, 2004.  The record contains no
evidence or testimony indicating that the gun discharged accidentally. 
Appellant=s inability to establish that the gun accidentally discharged precluded
the jury from finding that appellant acted recklessly and convicting appellant
only of misdemeanor deadly conduct.  See Johnson, 915 S.W.2d at 659-60; see
also Hayes, 728 S.W.2d at 809-10; Thomas, 699 S.W.2d at 850. 
Therefore, the trial court did not err in denying appellant=s request that the jury be instructed
on misdemeanor deadly conduct.  See Guzman, 188 S.W.3d at 188.

We
overrule appellant=s issue regarding the denial of his requests for jury
instructions on the offenses of misdemeanor and felony deadly conduct.

III.       Objection
to Jury Instruction on Law of Parties

Appellant
contends that the trial court erred by overruling his objection to the
inclusion in the jury charge of an instruction on the law of parties.  While
appellant=s brief identifies this issue as being presented for our review and
properly cites to the portion of the record discussing appellant=s objection to the jury charge,
appellant does not include any argument or cite to any legal authority regarding
this issue in his brief.  Appellant has not preserved this issue for review and
it is therefore waived.  See Tex. R. App. P. 38.1(i); Oldham, 5
S.W.3d at 847.

We
overrule appellant=s issue regarding the overruling of his objection to the
inclusion in the jury charge of an instruction on the law of parties.








Conclusion

The
trial court=s judgment is affirmed.

 

/s/      William J. Boyce

Justice

 

 

 

Panel consists of
Justices Boyce, Anderson, and Guzman.

Do Not Publish C Tex. R. App. P. 47.2(b).